COURT OF APPEALS OF VIRGINIA

UNPUBLISHED

Present: Judges O'Brien, Malveaux and Frucci

JACQUELINE BLEDSOE

                                        MEMORANDUM OPINION[*]

v.      Record No. 0655-24-2                      PER CURIAM
                                            OCTOBER 7, 2025

COMMONWEALTH OF VIRGINIA

FROM THE CIRCUIT COURT OF LOUISA COUNTY
Timothy K. Sanner, Judge

(William W. Stanton, VII; William W. Stanton, VII PLC, on brief),
for appellant. Appellant submitting on brief.

(Jason S. Miyares, Attorney General; Stephen J. Sovinsky, Assistant
Attorney General, on brief), for appellee.

A jury convicted Jacqueline Bledsoe ("appellant") of second-degree murder, in violation

of Code § 18.2-32, and use of a firearm in committing murder, in violation of Code § 18.2-53.1.[1]

On appeal, she challenges the sufficiency of the evidence to sustain both convictions. Finding no

error, we affirm the trial court's judgment.[2]

BACKGROUND

"On appeal, 'we review the evidence in the "light most favorable" to the Commonwealth,'

the prevailing party below." *Diaz v. Commonwealth*, 80 Va. App. 286, 295 (2024) (quoting

---

[*] This opinion is not designated for publication. *See* Code § 17.1-413(A).

[1] Appellant was indicted for first-degree murder, but the jury convicted her of
second-degree murder as a lesser-included offense.

[2] Having examined the briefs and record in this case, the panel unanimously agrees that
oral argument is unnecessary because "the appeal is wholly without merit." *See* Code
§ 17.1-403(ii)(a); Rule 5A:27(a). In addition, "the dispositive issue or issues have been
authoritatively decided, and the appellant has not argued that the case law should be overturned,
extended, modified, or reversed." *See* Code § 17.1-403(ii)(b); Rule 5A:27(b).

*Clanton v. Commonwealth*, 53 Va. App. 561, 564 (2009) (en banc)). "That principle requires us to 'discard the evidence of the accused in conflict with that of the Commonwealth, and regard as true all the credible evidence favorable to the Commonwealth and all fair inferences that may be drawn therefrom.'" *Id.* (quoting *Kelly v. Commonwealth*, 41 Va. App. 250, 254 (2003) (en banc)).

Beginning in March 2022, M.H.[3] lived in a camper parked on appellant's property. Appellant described M.H. as her "friend and renter," but the two had been romantically involved.

On the evening of June 4, 2022, appellant texted M.H. about picking up a "starter" the next day, to which he replied at 6:18 p.m., "You can get it yourself, I'm tired of being accused of shit, take someone else with you." At 6:41 p.m., M.H. texted appellant, "it doesn't take a brainstorm[4] to figure out someone. Kissing on a married man, going coon hunting with someone's boyfriend, come on, really, lol, trip you are." He texted again at 8:42 p.m.: "And I got by just fine in the past without anyone checking on me, so worry about yourself, thanks anyway." At 9:00 p.m. he texted: "and you can block me from now on, but it is the same thing."

That same evening, appellant visited her neighbor, Tracie Kwiatkowski, around 8:30 p.m. Kwiatkowski described appellant as "looking a little off." While she was at Kwiatkowski's house, appellant drank "three or four" beers and had a dispute with another visitor. Appellant left between 10:30 p.m. and 10:40 p.m.

At 12:20 a.m., appellant called the Louisa County Sheriff's Office non-emergency line to report that she had shot M.H. "when he attacked [her]" about an hour earlier. She reported that she had been "shoved around and scratched up" but that she was not injured.

---

[3] We use the victim's initials, rather than his name, to protect his privacy.

[4] A forensic investigator believed that M.H.'s phone autocorrected the phrase "brain surgeon" to "brainstorm."

When deputies arrived at appellant's property, they found M.H. lying, deceased, on the ground behind a barn. There was a visible gunshot wound in the center of his chest. Inside the barn was a "drag mark of blood" and a pool of dried blood. A shotgun was found on the front steps of appellant's house. While interacting with appellant, neither deputy observed that she had any injuries, and she did not complain to them about injuries. She also did not mention anything about a confrontation with M.H.

Detective Adam Bryant of the Louisa County Sheriff's Office interviewed appellant that night. She told him that she and M.H. had argued before dinner. She consumed a few beers, then went to Kwiatkowski's house. Appellant stated that when she returned, M.H. met her in her driveway, pushed her down, and yelled and cursed at her. She said M.H. then followed her into her house and down the hall to her bedroom, where he threw her down on the carpet, mounted her, and held his hands on or around her neck. Bryant did not observe any marks on her neck and he had not seen any indications of a struggle in appellant's bedroom.

Appellant told Bryant that M.H. eventually "got up and just left." She said that after she "had cooled off and felt the situation was diffused," she retrieved a .20-gauge shotgun, loaded it with one round of buckshot, and went out to her barn to put her dogs in their crates. When she entered the barn, she placed the shotgun on a table.

Appellant stated that she was in the barn for about five minutes when M.H. arrived and called her a "slut." M.H. had no weapons in his hands. M.H. "took a big step" towards appellant, but he did not "use his fists" or threaten to harm her. He was seven feet away from appellant when she "reached around to her right and raised up the gun, swung it around, and fired . . . one shot," killing M.H. She did not render aid or call 911. Instead, she dragged his body "out the backdoor of the barn by his feet."

When asked why she shot M.H., appellant initially responded, "because he put me down earlier," then, "[b]ecause [M.H.] was in the barn and not supposed to be in there," and finally, because she was "scared." She stated that she did not call 911 because her phone was in the house. When asked why she did not call after the alleged assault in the bedroom, she said the phone was in another room. Confronted about her lack of remorse, appellant stated that she was "just a cold person."

Appellant told Bryant that after shooting M.H., she went to visit her neighbor, Tom Hough. Appellant initially told Bryant that she could not remember what she discussed with Hough, but later said they talked about the dogs. She also said that Hough told her she would not go to jail if the killing was in self-defense.

Bryant left appellant in a holding cell. When he returned about three hours later, appellant showed him an abrasion on her elbow which looked "fresh." Bryant asked appellant twice where the abrasion had come from; she replied only that she "had injuries."

The medical examiner's report documented a "close-range shotgun wound" to M.H.'s torso, the trajectory of which was "front to back" and which caused his death. Individual buckshot pellets were still in M.H.'s body.

At trial, Hough testified that appellant came to his house around midnight the night of the shooting. Appellant told him that "she had shot [M.H.] and that she didn't have to worry about him anymore." Hough was "scared" because appellant did not show any emotion, and because she had once sent Hough a text stating that she "was going to own everything that [M.H.] has and kick him off [her] property." In describing the events leading up to the shooting, appellant told Hough that M.H. "came at her in the barn" but did not say that M.H. had any weapons. Nevertheless, Hough suggested "if it was self-defense . . . she wouldn't go to jail," and she would need to show "choking, bruises on [her] arms, things like that." Hough did not see any

signs of injury on appellant. He suggested that appellant should call the police because the "longer she waited the less it look[ed] like self-defense."

Appellant moved to strike the evidence, arguing that there was "internal conflict" in the evidence. The trial court denied the motion.

Testifying in her defense, appellant denied that M.H. was her "boyfriend" but described having more than one consensual sexual encounter with him. Appellant claimed that, on the evening of the shooting, M.H. had "pushed [her] down" on her driveway and accused her of kissing her neighbor's husband. She did not notice any scrapes or injuries on her at the time, but "noticed bruises later." M.H. then followed her into the house and into her bedroom, where he "slammed [her] down on the carpet on [her] back," "straddled" her with one hand "wrapped around [her] throat" and "squeez[ed]." She admitted that she had not mentioned "choking or strangling" to the investigators.

Appellant stated that, after M.H. left her bedroom, she took out her shotgun and loaded it. She went to the barn, put the gun on a table, and was in the process of putting her dogs in their crates when M.H. came in. M.H. called appellant a "slut" and came towards her with "his arms down and his fists balled up." Appellant grabbed her shotgun, pointed it at him, and warned him not to come any further, but he "lunge[d]" towards her. M.H. had no weapons in his hands, made no threats, and did not try to grab the shotgun. Appellant pulled the trigger, and M.H. fell down on his back.

Appellant moved M.H.'s body within six minutes of shooting him, then drove away. Appellant recalled going to Hough's house and telling Hough that she shot M.H. She maintained that Hough had lied about their self-defense discussion and thought "a good portion of his testimony was not truthful." Finally, appellant agreed that she had given "a lot of additional facts" during her testimony that she had not given police.

Appellant renewed her motion to strike, again pointing to "internal conflicts" in the evidence and adding the argument that "there was no premeditation or malice." The trial court denied the motion.

The jury convicted appellant of second-degree murder and use of a firearm while committing murder. This appeal followed.

ANALYSIS

"When an appellate court reviews the sufficiency of the evidence underlying a criminal conviction, its role is a limited one." *Commonwealth v. Garrick*, 303 Va. 176, 182 (2024). "The judgment of the trial court is presumed correct and will not be disturbed unless it is 'plainly wrong or without evidence to support it.'" *Pijor v. Commonwealth*, 294 Va. 502, 512 (2017) (quoting Code § 8.01-680). It is not for an appellate court "to say that the evidence does or does not establish [the defendant's] guilt beyond a reasonable doubt because as an original proposition it might have reached a different conclusion." *Commonwealth v. Barney*, 302 Va. 84, 97 (2023) (alteration in original) (quoting *Cobb v. Commonwealth*, 152 Va. 941, 953 (1929)). "Rather, the relevant question is whether '*any* rational trier of fact could have found the essential elements of the crime beyond a reasonable doubt.'" *Cappe v. Commonwealth*, 79 Va. App. 387, 398 (2024) (quoting *Vasquez v. Commonwealth*, 291 Va. 232, 248 (2016)). "If there is evidentiary support for the conviction, 'the reviewing court is not permitted to substitute its own judgment, even if its opinion might differ from the conclusions reached by the finder of fact at the trial.'" *McGowan v. Commonwealth*, 72 Va. App. 513, 521 (2020) (quoting *Chavez v. Commonwealth*, 69 Va. App. 149, 161 (2018)).

I. Second-Degree Murder

Appellant argues that the evidence was insufficient to prove she committed second-degree murder because she acted without malice.

"In Virginia, every unlawful homicide is presumed to be murder of the second degree." *Tizon v. Commonwealth*, 60 Va. App. 1, 10-11 (2012) (quoting *Pugh v. Commonwealth*, 223 Va. 663, 667 (1982)). "Second degree murder . . . is defined as a malicious killing." *Woods v. Commonwealth*, 66 Va. App. 123, 131 (2016). "Second-degree murder does not require a specific intent to kill." *Tizon*, 60 Va. App. at 11. Rather, if the accused acts with malice, she "need only intend 'to perform the conduct' causing the victim's death." *Id.* (quoting Ronald J. Bacigal, *Criminal Offenses and Defenses* 340 (2011-12)). "Malice inheres in the doing of a wrongful act intentionally, or without just cause or excuse, or as a result of ill will." *Burkeen v. Commonwealth*, 286 Va. 255, 259 (2013) (quoting *Dawkins v. Commonwealth*, 186 Va. 55, 61 (1947)). "Malice is evidenced either when the accused acted with a sedate, deliberate mind, and formed design, or committed any purposeful and cruel act without any or without great provocation." *Diaz*, 80 Va. App. at 314 (quoting *Woods*, 66 Va. App. at 131). "The presence of malice is a question of fact to be determined by the fact finder." *Luck v. Commonwealth*, 32 Va. App. 827, 833 (2000).

Contrary to appellant's argument, the record supports the jury's conclusion that appellant acted with malice. Appellant announced to multiple individuals and to the jury that she deliberately shot M.H. because he "came at" her in the barn. "Volitional acts, purposefully or willfully committed, are consistent with a finding of malice and inconsistent with inadvertence." *Id.* What is more, she used a shotgun to do so, and "malice may be implied from use of a deadly weapon." *Flanders v. Commonwealth*, 298 Va. 345, 358 (2020). This evidence, combined with her lack of emotion or remorse about the killing, her attempts to characterize the killing as self-defense, her describing herself as "just a cold person," and the text she sent to Hough stating that she "was going to own everything that [M.H.] has and kick him off [her] property," further supports the reasonable inference that appellant acted with malice.

Appellant also argues that she acted in self-defense. "Self-defense is an affirmative defense which the accused must prove by introducing sufficient evidence to raise a reasonable doubt about his guilt. Whether an accused proves circumstances sufficient to create a reasonable doubt that he acted in self-defense is a question of fact." *Hughes v. Commonwealth*, 39 Va. App. 448, 464 (2002) (quoting *Smith v. Commonwealth*, 17 Va. App. 68, 71 (1993)). "To justify the use of deadly force, the defendant must have reasonably feared death or serious bodily injury from his victim, and there must have been an overt threat." *Caison v. Commonwealth*, 52 Va. App. 423, 440 (2008) (quoting *Peeples v. Commonwealth*, 30 Va. App. 626, 634 (1999) (en banc)). The overt threat must be "an act suggesting present danger which 'afford[s] a reasonable ground for believing there is a design . . . to do some serious bodily harm, and imminent danger of carrying such design into immediate execution.'" *Jones v. Commonwealth*, 71 Va. App. 70, 86 (2019) (alterations in original) (quoting *Commonwealth v. Sands*, 262 Va. 724, 729 (2001)). "[T]he amount of force used must be reasonable in relation to the harm threatened." *Caison*, 52 Va. App. at 440 (alteration in original) (quoting *Diffendal v. Commonwealth*, 8 Va. App. 417, 421 (1989)).

Here, appellant told Bryant that she and M.H. had argued before dinner that night. M.H. then ended his relationship with appellant by text message. When appellant visited Kwiatkowski later that evening, appellant appeared "a little off," consumed alcohol, and had a dispute with another individual. From this, the jury was entitled to infer that appellant was agitated due to the issues with her relationship with M.H., and thus that she harbored ill feelings towards him when she returned home. And even if the jury credited appellant's testimony that M.H. called her a derogatory name and "lung[ed]" at her, she was consistent in reporting that he carried no weapons, made no threats, and did not attempt to take the shotgun from her. In fact, she told Bryant that M.H.

- 8 -

was still seven feet away from her when she shot him. Thus, there was no evidence that appellant had any reasonable apprehension of death or bodily harm at the time of the shooting.

There was also no indication that appellant reasonably feared M.H. at any point that evening. Even if the jury credited her description of the assault in her bedroom, appellant told Bryant that she only retrieved and loaded the shotgun after she "had cooled off and felt the situation was diffused." The jury was not required to believe appellant's self-serving account that M.H. assaulted her, especially in light of her apparent attempt to provide evidence of injuries after the fact, and Hough's testimony that he suggested she would not go to jail if the shooting were in self-defense. *See Dalton v. Commonwealth*, 64 Va. App. 512, 525 (2015) ("Determining the credibility of witnesses . . . is within the exclusive province of the jury, which has the unique opportunity to observe the demeanor of the witnesses as they testify." (alteration in original) (quoting *Lea v. Commonwealth*, 16 Va. App. 300, 304 (1993))).

Appellant admitted that she shot M.H. at close range with a shotgun, even though he presented no overt threat. Appellant did not mention a confrontation with M.H. to police when they first arrived, and her explanation that she shot M.H. because she was "scared" was the last of three different explanations she gave to Bryant. Even if appellant's account of the assaults were true, "'[b]are fear that a person intends to inflict serious bodily injury on the accused, however well-grounded,' is insufficient without an overt act." *Jones*, 71 Va. App. at 86 (quoting *Yarborough v. Commonwealth*, 217 Va. 971, 975 (1977)). The only action M.H. took was taking "a big step," or "lung[ing]," towards appellant, an act which presented no reasonable grounds for believing he intended to seriously injure her. And appellant's reaction of shooting M.H. in the chest with a shotgun was in no way reasonable in relation to any harm threatened by his moving towards her, especially if the jury believed appellant's own testimony that M.H.'s arms were down when he did so. Thus, the record supports the jury's conclusion that appellant did not act in

self-defense. Consequently, the trial court did not err in finding the evidence sufficient to convict appellant of second-degree murder.

## II. Use of a Firearm

Appellant further contends that, because she did not commit second-degree murder, there was insufficient evidence to convict her of using a firearm while doing so. But this argument is entirely derivative of her challenge to the sufficiency of the evidence to sustain the murder conviction. Having concluded that the evidence was sufficient to prove that appellant committed second-degree murder, we also reject her challenge to the firearm conviction because she admitted herself that she used a shotgun to kill M.H.

## CONCLUSION

For the foregoing reasons, the trial court's judgment is affirmed.

*Affirmed.*